FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

JUN 1 4 2005

DAVID J. MALAND, CLERK
BY
DEPUTY _____

Anthony A. Whitehurst et. al.          )
    Plaintiff                               )
                                            )
vs.                                     )          Civil Action No. _____
                                            )
SHOWTIME NETWORKS, Inc.                 )          1:05CV0407
A Viacom Company                        )
    Defendant

## COMPLAINT

On behalf of himself and all others similarly situate, Plaintiff state the following for his complaint against the defendant:

1.    This is a class action and/or a civil action, brought by the Plaintiff on behalf of the classes of persons who are the Statutory Registered and vested owners, of the Property Rights, for the use of the name, voice, signature, photograph, or likeness, of the deceased individual James Byrd, Jr.  Plaintiff seeks declaratory relief pronouncing that the methods of the defendant amounted to "unfair methods of competition" which injuriously affected or tended to injuriously affect the business of the Plaintiff class; and to accomplish the unfair methods of competition the defendant used deceptive acts or practices in commerce, which are outlawed. Besides the anticompetitive effect the defendant's actions were at all times to create a monopoly of locking out (a) minorities such as African Americans and (b) Victims and families of victims, of cer/tain positions within the film and movie industry.  All in violation of Title 15 USC etq.

2.    The Plaintiff, for himself and on behalf of all class members, further seeks monetary relief to compensate them for the

various opportunities in the entertainment (including film & movie) industry that has been substantially lessen, restricted, abolished or otherwise injured, by the defendant's willful conduct.

## JURISDICTION

This Court has subject matter jurisdiction pursuant to (a) 28 U.S.C. §1332, since there is diversity of citizenship and this is a civil action involving, exclusive of interest and costs, a sum in excess of $50,000.00; (b) 28 U.S.C. §1337, involving Commerce and antitrust regulations; and (c) 28 U.S.C. §1367, pursuant to Supplemental jurisdiction.

## VENUE

Venue is appropriate in this judicial district under 28 U.S.C. §1391(a) because a substantial part of the events or omissions giving rise to the claim occurred herein; and (2) 28 U.S.C. §1391(c) Because the defendant is a corporation whom shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced.

## THE PARTIES

Plaintiff Anthony Antonio Whitehurst is a 17% Registered Owner of the Property Rights, for the use of the name, voice, signature, photograph, or likeness of the deceased individual James Byrd, Jr., as proscribed under Chapter 26, of the Texas Property, Code. The Plaintiff shares ownership with the Adminstrix of the Estate of James Byrd, Jr., one Ross Payne Byrd, who has Registered 75% of the ownership on behalf of himself and two siblings Francis Renee

Byrd Mullins and Jamie Alexandria Byrd.  By contract agreement
Eligah Ricky Jason is entitled to an 8% ownership stake.  The
Plaintiff is a citizen of the State of Texas, and also those
whom share in the ownership of the Property Rights are citizens
of the State of Texas.

Defendant Showtime Networks Inc. is a corporation registered
in a state unknown to Plaintiff at this time, that has been con-
ducting business within the State of Texas.  The defendant's
principle place of business address is 10880 Wilshire Blvd; Los
Angeles, CA 90024.

### FACTS

1.   Beginning as early as 2001, the defendant began developing
a motion picture project based on the life story of James Byrd,
Jr. and the aftermath that followed his tragic death.  Allegedly
an individual producer had brought the project to Showtime.

2.   This individual producer allegedly convinced Showtime that
he had secured the life story rights from the estate of James
Byrd, Jr.

3.   On behalf of the children of James Byrd, Jr. Eligah Ricky
Jason corresponded by phone, fax and mail numerous times, with
David Stern, the Senior Vice President, of Business Affairs, for
Showtime Networks Inc. the defendant, regarding the potential
motion picture.

4.   As early as 1999, Eligah Ricky Jason, had been engaged in
various business ventures surrounding the Property Rights of
James Byrd, Jr. and was looking to expand.  He contacted Plaintiff

who had been a co-intervenor in a copyright infringment suit
against Sony, EMI Virgin Music and C+C Music Factory.

5.    Plaintiff had been engaged in writing song lyrics, book &
screenplay manuscripts, poetry, and motivational speeches, etc.,
to create content for his intended entertainment company, for
eight years steady at the time he was contacted by Eligah Jason.
Plaintiff suggested that they market the commercial value in the
Property Rights.

6.    Plaintiff and Jason finalized a deal with the children of
James Byrd, Jr., as early as March 17, 2002, in relation to
transferring partial ownership of the Property Rights over to
them, for the purposes of marketing said Property Rights.

7.    On April 04, 2002, Ross Byrd was officially granted the
position of SOLE ADMINISTRATOR of the Estate of James Byrd, Jr.
(his father), by Judge Golden, in the Probate Court of Jasper
County, Texas, in Jasper, Texas.  There had been no other admin-
istrator prior to this date, whom could have given the individual
producer the 'life story rights.' of James Byrd, Jr. as detailed
in ¶ 2 supra.  Which the Plaintiff class gave the defendant notice
of on numerous occasions.

8.    A series of correspondences had been exchanged previously
between Jason and the Senior Vice President, of Business Affairs,
for defendant Showtime Networks, Inc. David Stern, to include but
not limited to the following:

          1. A Nov. 23, 2001, letter from Jason to Stern.
          2. A Nov. 28, 2001, letter from Stern to Jason.
          3. A Jan. 3, 2002, letter from Jason to Stern.
          4. A Jan. 9, 2002, letter from Stern to Jason.
          5. A Feb. 1, 2002, letter from Jason to Stern.

Which are all adopted and incorporated herein as set forth in
full therein.  (See Exhibits 1 through 5)

9.   Now that Plaintiff was associated with the Byrd(s) and Jason,
and had been brought up to speed on all of the events.  Plaintiff
prepared in the name of Jason, a 'MEMORANDUM' setting out specific
subjects concerning the Property Right Owners' (1) Legal perspec-
tives, (2) Emotional cry, and (3) Business & Economics opportuni-
ties, to be presented to the defendant.  There were 7 appendixes
accompanying the memorandum.

10.  On April 29, 2002, Eligah R. Jason sent the memorandum and
appendixes to Showtime's David Stern, certified mail return re-
ceipt number 7001 0360 0001 7153 1812 and Showtime's Jerry Offsay,
certified mail return receipt number 7001 0360 0001 7153 1805.
The memorandum and appendixes are adopted and incorporated herein
as set forth in full therein.  (See Exhibit 6)(& 6b)

11.  Once David Stern and Jerry Offsay received and reviewed the
memorandum and appendixes, David Stern telephoned Jason.  Jason
was not at home, at the time, so David Stern left a message on
Jason's answering machine, pointing out:

>     (a) That they (Showtime) had signed with the right
>     people over the estate in securing the life story
>     rights of James Byrd, Jr. and to utilize his name,
>     voice, signature, photograph or likeness, in their
>     movie, and;
>
>     (b) That y'all (Plaintiff Class) wanted 50%, and that
>     50% of nothing was nothing, so back off and we will
>     get back with you all.

12.  David Stern and Jerry Offsay had understood the Plaintiff
class's intent to expand into the film & movie industry as a
co-executive producer, by funding in part/full the budget of

a movie relating to their Property Rights, by raising funds to
do so, as outlined in the memorandum and appendixes, in order
to receive commerce.

13.  David Stern and Jerry Offsay further understood the Plaintiff
class's desired intent to start at the box office and decline to
DVD sales and rental, then licensing to Cable & Network stations,
such a project relating to their Property Rights, in order to
maximize the commercial value that could be obtained in commerce.

14.  David Stern and Jerry Offsay had understood the Plaintiff
class's intent to market their 'consent' to other media and
entertainment companies, to use the name, voice, signature, photo-
graph or likeness, of James Byrd, Jr. (Property Rights), in
commercializing and advertising any films and movies that the
other media and entertainment companies desired to air relating
to James Byrd, Jr., in order for the Plaintiff class to receive
commerce.

15.  David Stern and Jerry Offsay had understood the Plaintiff
class's intent and desire to develope a commercial clip, for
the film on their Property Rights, and to be able to obtain
corporate sponsors and endorsers for said commercial clip, as
a way for the Plaintiff class to receive commerce.

16.  All of said ideas were outlined briefly within the memorandum
and appendixes, within the section on Business & Economics.

17.  Based on David Stern's message that "we will get back with
you all" in relation to his acknowledgment that Plaintiff class
wanted to act as a co-executive producer in relation to the films

that included their Property Rights.  Coupled with the fact

outlined in the memorandum @ pg 6 that:

> "Thus we have been granted and will in fact be
> shopping these property rights to several media/
> entertainment giants, **only after considering your
> position(s) and proposal(s) first.  Out of courtesy
> and fundamental fairness,** since most of this venture
> has been unfortunately dropped in your lap by the
> independent producer, who ironically hadn't actually
> secured the lawful rights to the life story, tragic
> death and aftermath following the death of the chara-
> cter James Byrd, Jr., to be depicted in the motion
> picture, in which the entire motion picture is centered
> around and based on.  The children have their own
> stories to tell."

> "In the event we can't reach an agreement, for the
> sake of James Byrd, Jr.'s children, we hope that
> Showtime/Viacom out of courtesy and fundamental fair-
> ness will not monopolize the story rights of other
> characters to be depicted in the motion picture.
> That Showtime/Viacom and the independent producer
> have already secured through option agreements, in
> order to paralize and obstruct our ability to shop
> the project or a similar project to other media/enter-
> tainment conglomerates.  (i.e. Sony, Vivindi, Liberty,
> News Corp, Disney, AOL Time Warner etc.)  We have
> our own stories to tell."

The Plaintiff class waited patiently for the defendant via David

Stern to get back with them.

18.  On or about June 6, 2003, the defendant aired its movie

"JASPER TEXAS" on the life story, tragic death and aftermath

that followed the tragic death of James Byrd, Jr.  The defendant

had never gotten back with the Plaintiff class.

19.  The defendant knowingly and intentionally deceived the

Plaintiff class into believing that defendant would get back

with the Plaintiff class in relation to the memorandum & appendixes

business and economics opportunities, in order to complete their

film project and air it on its Cable station, before the Plaintiff

class could market their Property Rights commercial value, to any

other media and entertainment conglomerates. Which by design results

in substantially lessening, restricting, abolishing or otherwise

injuring the likelihood of the Plaintiff class being able to receive

commerce, based on their Property Rights commercial marketability.

20.  The defendant's acts described in ¶ 19 also by design results

in deminishing the marketability of the Plaintiff's Property Rights.

21.  The defendant's acts described in ¶ 19 also substantially les-

sened the Plaintiff class chances becoming Executive and/or Co-Exec.

Producers in the film & movie industry.

22.  Furthermore, at all times the tragic death of James Byrd, Jr.

was defined as an African American (Minority) holocaust, and that

the three children (Ross, Renee & Jamie Byrd) were the surviving

children of such holocaust, within the memorandum.

23.  The defendant took this African American holocaust and commercia-

lized the holocaust for its own prestige and profits; and did so to

prevent the very African Americans who are the descendants of the

holocaust, (who registered and own the statutory Property Rights)

to the use of the name, voice, signature, photograph or likeness,

of the deceased individual (victimized character of the holocaust),

from being able to commercialize and profit themselves from their

own family holocaust.  And/or substantially lessened their opportunities.

24.  Without the respect to race, the defendant took this family

tragedy and commercialized it for its own prestige and profits;

and did so to prevent the very family members whom the property

rights vest to by law, from being able to commercialize and profit

themselves, from their own family's tragedy.  And/or substantially lessened the family's opportunities.

CAUSE OF ACTION

1.  The Plaintiff class hereby incorporate by reference each and every allegation made in the preceding paragraphs as if fully set forth herein.

2.  The actions of the Defendant and its employees, including, but not limited to, those activities and omissions set forth in the preceding paragraphs, constitutes unfair methods of competition, deceptive acts or practices in commerce, both to create an anticompetitive effect in commerce, in violation of Title 15.

3.  The aforemention activities of the Defendant and its employees which were undertaken were not designed to enhance but to monopolize and stiffle commerce (i.e. commercialization of Plaintiff class's Property Rights) within the film and movie industry, to include advertising revenues to be generated therefrom etc.

4.  With respect to ¶ 3 above, it was also not designed to enhance but to monopolize by locking out (a) minorities; and (b) families of victims, from certain higher positions within the film and movie industry, and to stiffle commerce therefrom, within the industry and from (a) minorities; and (b) families of victims.

5.  As a result of the diminishment of their Property Rights, by ambush after being deceived, while it was known by the defendant that Plaintiff sought to market the comercial value of their Property Rights, the Plaintiff class have suffered enormous damages, including, but not limited to, monetary damages, mental anguish and emotional distress and devastating financial opportunity losses.

JURY DEMAND

1.     Plaintiff class demands a Trial by jury, pursuant to Rule 38
of the Federal Rules of Civil Procedures.

REQUESTED RELIEF

WHEREFORE, the Plaintiff class respectfully pray:

A.     That judgment be entered against the defendant SHOWTIME
NETWORKS, Inc. for the listed causes of action.

B.     That the Plaintiff class be awarded accumulative damages,
actual damages, compensatory damages, consequential damages, dis-
cretionary damages, expectation damages, foreseeable damages, future
damages, incidental damages, irreparable damages, prospective damages,
punitive damages, rescissory damages totaling $65,000,000.00¢,
along with attorney fees and costs incurred in bringing this
action against the defendant.

C.     That the Court grant such other and further relief as is
deemed just and equitable, to include the appointment of counsel.

Respectfully Submitted

Anthony A. Whitehurst
Reg. No. 04938-078
FCC Beaumont Low Security
P.O. Box 26020
Beaumont, Texas 77720

Dated: 6-5-5
Mailed 6-5-5

Respectfully Submitted
Ross P. Byrd and Ross P.
Byrd, in his capacity as
Administratrix of the Estate
of James Byrd, Jr.

Ross P. Byrd
1204 Henry
Lufkin, Texas 75901